Filed 5/28/26  Sandles v. Cal. Commission on Teacher Credentialing CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DAVID LEE SANDLES,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA COMMISSION ON TEACHER CREDENTIALING,<br><br>Defendant and Respondent. | F089140<br><br>(Super. Ct. No. BCV-23-102712)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Gregory A. Pulskamp, Judge.

Prometheus Civic Law and Matthew Sean Harrison for Plaintiff and Appellant.

Rob Bonta, Attorney General, Carl W. Sonne, Assistant Attorney General, Joshua A. Room, Shawn Paul Cook, and Matthew A. King, Deputy Attorneys General, for Defendant and Respondent.

-ooOoo-

## INTRODUCTION

Appellant David Lee Sandles seeks review of the denial of his petition for a writ of administrative mandamus, which sought to set aside the decision of respondent California Commission on Teacher Credentialing revoking his teaching credentials. Appellant asserts the trial court applied the wrong standard of review by inappropriately deferring to respondent's findings, rather than conducting a limited trial de novo. Further, appellant claims the court did not apply the factors set forth in *Morrison v. State Board of Education* (1969) 1 Cal.3d 214 (*Morrison*), the seminal case on judicial review of the revocation of teaching licenses. We agree with appellant on both counts. The court applied neither the correct test nor the correct standard of review in evaluating respondent's decision. We find these errors were prejudicial, as it is reasonably probable the court would not have reached the same conclusions as respondent, had it approached this case using its independent judgment, rather than deferring to the agency. Accordingly, we reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant first became credentialed as a teacher in California in April 2001, ultimately holding multiple subject and specialist instruction credentials. Appellant began working for the Bakersfield City School District (BCSD)[1] in 2004, working as an elementary and middle school teacher. By all accounts, appellant was an accomplished, well-regarded, and effective instructor, and was respected and liked by his colleagues as well as his students and their parents. He obtained a master's degree in education in 2011 from California State University, Bakersfield (CSUB), and a doctorate in education in 2013 from California State University, Fresno. Appellant taught primarily low-income and English learning students with "multiple educational and mental health challenges."

---

[1]     BCSD is a large school district, comprising almost 30,000 students, over 4,000 employees, and more than 40 schools.

He was named Teacher of the Year in 2008–2009, established and ran a successful spelling bee program, received positive teacher evaluations, ran a districtwide summer training institute for more than 500 teachers, and was the team lead for his middle school's Positive Behavioral Interventions and Supports program, which received an award.

Appellant's relationship with his superiors became contentious in 2017. At a May 2017 meeting of the local school board, appellant publicly spoke out about the new superintendent's demotion of his middle school principal and installation of a new principal. Both appellant and his wife continued to speak out at various school board meetings between 2017 and 2019, apparently consistently at odds with the administration over various issues, including the cancellation of a summer school program appellant taught and the failure to raise teacher salaries. Because of his comments at these meetings, appellant claims he was the subject of hostility and retaliation from the superintendent and the new principal. This included critical comments and other communications from the principal and/or superintendent, the cancellation of programs appellant had been involved with, exclusion from school board meetings, removal of appellant from certain additional responsibilities, reprimands to appellant for taking students off campus, a refusal to allow appellant a work-free break for lunch, and overheard conversations about the superintendent and/or principal " 'getting rid' " of appellant. Further, appellant learned the superintendent had threatened to contact unspecified "friends" who worked for respondent to make sure appellant's teaching credentials were revoked. Ultimately, in April 2019, appellant began to see a therapist and a physician, because he began experiencing panic attacks, difficulty sleeping, depression, and heart palpitations due to his stress level from his working environment.

Prior to the start of the 2019–2020 school year, appellant was unsure whether he would return to work for BCSD, given his concerns about retaliation and the impact on his health. Because he needed to continue to work, he applied for and was offered a

3.

teaching position at CSUB.  As the 2019–2020 school year began at BCSD, appellant took a leave of absence, which was ultimately approved by the district, between August 12 and September 14, 2019.[2]  During this period, the human resources department for BCSD contacted appellant and advised that he needed to submit a request for medical leave form showing his leave was approved by a doctor.  Appellant provided such a note on the district's form,[3] signed by his doctor, excusing him from work for the above period.

The crux of this case is that appellant continued teaching for CSUB during his leave period from BCSD.[4]  An assistant superintendent for BCSD was browsing a social networking site while at work and saw photos of appellant posted on a CSUB social media page.  The photos contained no time stamps, and because BCSD teachers were allowed to have employment outside of BCSD, the photos themselves did not depict appellant doing anything necessarily improper.  The assistant superintendent then decided to investigate the matter further, calling a contact of his at CSUB and then independently researching appellant's teaching schedule at CSUB.  In doing so, the assistant superintendent discovered the class appellant was teaching for CSUB would have overlapped with his work for BCSD, had he not been on leave.  The superintendent with whom appellant had been involved in an ongoing dispute then contacted the human

[2]  According to testimony from a human resources employee at BCSD, if a teacher took a leave of absence, it would first come out of sick leave.  Teachers accrued 11 days of sick leave per year; if they did not use all of it, it would roll over to subsequent school years.

[3]  The form appears to be a combined form used for all forms of medical leave, including those requested pursuant to the federal Family and Medical Leave Act (FMLA) and the California Family Rights Act (CFRA), as well as for extended pregnancy disability leave.  It specifically directs the physician not to include or disclose any medical diagnosis.

[4]  BCSD permitted teachers to hold outside employment, so long as it did not conflict with their work duties at BCSD.  Indeed, appellant had taught as an adjunct professor at other universities during his tenure with BCSD.

resources administrator for BCSD and directed her to investigate appellant's purported misuse of leave. The human resources administrator and the associate superintendent then showed up unannounced during appellant's class at CSUB and confronted him, ultimately demanding that he come see them after the class concluded. Appellant did not go see the human resources administrator, but instead sent her an email resigning from BCSD. Various BCSD personnel testified that this use of leave violated the school district's leave or other policies, although the basis for this conclusion appears to be strictly their testimony, as no written policies to this effect were apparently introduced into evidence.

Unrelated to the current dispute between appellant, BCSD, and respondent, in 2002, appellant was arrested following an argument and "minor physical altercation" between appellant and his wife. During the argument, at some point, appellant purportedly kicked his wife in the back of her right calf, which left a "very slight red mark on her leg." Appellant was arrested and charged with two misdemeanors for violating Penal Code section 243, subdivision (e)(1) (battery of a spouse) and Penal Code section 415, subdivision (2) (disturbance of another person by loud and unreasonable noise). He ultimately pleaded no contest to a misdemeanor violation of Penal Code section 415 for disturbing another by a loud and unreasonable noise, which was later expunged.[5] Appellant disclosed this conviction to respondent in 2002, the year the incident occurred. Appellant and his wife remain married.

Following appellant's resignation from BCSD, respondent brought disciplinary proceedings against appellant. Respondent alleged that appellant's teaching credentials

---

[5]     We note that respondent, in its decision, repeatedly refers to appellant's "domestic violence," seemingly to cast further disapprobation upon appellant and bolster its conclusion to revoke his credentials. Given that appellant was never convicted of a domestic violence or battery charge, we will refer to this as the "misdemeanor" or "misdemeanor conviction" throughout this opinion.

should be revoked for unprofessional conduct, unfitness for service, immoral conduct, persistent defiance of and refusal to obey laws, and acts of moral turpitude, based on the fact of his 2002 conviction and his use of leave in violation of BCSD's policies.

The matter was heard by an administrative law judge (ALJ) between October 19 and 20, 2022, who heard testimony and took documents into evidence. The ALJ concluded respondent had demonstrated appellant had engaged in unprofessional and immoral conduct by violating BCSD's leave policies,[6] and had committed an act involving moral turpitude, finding appellant's submission of a medical leave form was "dishonest" because it allowed him "to delay his inevitable decision about which job to maintain and which job to resign from," which was "contrary to the duties he owed to [BCSD] and [his] students." The ALJ found appellant had not engaged in persistent defiance of any laws and that respondent had failed to demonstrate appellant's unfitness to teach. The ALJ noted that most of appellant's career with BCSD was "marked by quality teaching, leadership, and volunteering with his students to help them achieve educational accomplishments, without issues raised by [BCSD]." According to the ALJ, appellant "has continued his contribution to education, leadership, and to his community through his work with CSUB." Further, the ALJ noted that, "[w]hile not justified or excusable, [appellant's] violative conduct is attributable to his increasingly negative work environment and removal from many of his [teaching] duties, and to a weakness in character not previously or subsequently demonstrated."

While the ALJ found appellant's behavior "adversely affected" his students, because it did not allow the district to permanently fill his position "though he likely knew he would not return to work for [BCSD]," "any harm caused to the students was temporary and isolated in nature." Further, while the conduct occurred over the course of

---

[6]     The ALJ found the disclosed and expunged misdemeanor conviction was irrelevant to the current disciplinary proceedings.

approximately one month, the ALJ noted it "presented as one event of misconduct, and not as multiple acts of wrongdoing or as a pattern of misconduct," and was "unlikely" to reoccur. Although the ALJ concluded appellant had made misrepresentations in his testimony and submissions that showed indifference and a lack of remorse for his conduct, it found appellant's "misconduct is not deemed the most serious, if for no other reason [than] he did not directly harm any student physically or emotionally. [Appellant] was suffering emotional or physical difficulties which substantially contributed to the misconduct. Having found and maintained work elsewhere, [appellant] no longer has such difficulties. [Appellant's] general good character was demonstrated through his character witnesses and through his years of service to his students, employers, and to the field of education." Based on all of these findings and the ALJ's consideration of the evidence, the ALJ concluded revocation of the credentials was excessive, and directed that appellant's credentials be suspended for one year.

Respondent rejected the ALJ's findings and decision in February 2023. Respondent found that it had demonstrated appellant engaged in unprofessional conduct, immoral conduct, and acts of moral turpitude. Respondent concluded it had not demonstrated appellant showed a persistent defiance of any laws or unfitness to teach. The basis for these conclusions was both appellant's 2002 criminal conviction and his violation of BCSD's leave policies. Respondent found that the only way to protect the public was to revoke appellant's teaching credentials.

In August 2023, appellant filed a petition for writ of mandate to review respondent's order revoking his teaching credentials. The trial court denied appellant's writ, finding that it must defer to the propriety of any penalty imposed by an administrative agency unless there has been a "manifest abuse of discretion." It noted it could only intervene if the penalty was an " 'arbitrary, capricious or patently abusive exercise of discretion.' " While noting it would have given a "slight preference to the penalty proposed by the ALJ," it concluded the penalty imposed by respondent was "still

certainly within the bounds of reasonable discretion." Judgment was entered in November 2024. A notice of appeal was timely filed.

## DISCUSSION

*A. Legal Standards*

Administrative mandamus actions such as this one are brought under Code of Civil Procedure section 1094.5, which allows for a court to review "the validity of any final administrative order or decision made as the result of a proceeding" where "a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested." (Code Civ. Proc., § 1094.5, subd. (a).) "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (*Id*., subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid*.) "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." (*Id*., subd. (c).)

Courts apply the independent judgment standard when the administrative action substantially affects a fundamental vested right. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 789; *Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392, 395; *Bixby v. Pierno* (1971) 4 Cal.3d 130 (*Bixby*)[7].) Proceedings to revoke a professional license substantially affect a fundamental right. (*Sandarg v. Dental Board of California* (2010) 184 Cal.App.4th 1434, 1440; *Owen v. Sands* (2009)

---

[7]     *Bixby* is the seminal case which first clearly articulated that fundamental vested rights are subject to independent judgment review by courts following action by an administrative agency. (*Bixby*, *supra*, 4 Cal.3d at pp. 144–147.)

176 Cal.App.4th 985, 991; *Evans v. Department of Motor Vehicles* (1994) 21 Cal.App.4th 958, 967, fn. 1; see Ed. Code, § 44945 ["The court, on review, shall exercise its independent judgment on the evidence."].) The parties agree the trial court was required to utilize the "independent judgment" standard.

In implementing the "independent judgment" standard, trial courts are directed to "afford a strong presumption of correctness" to the administrative findings, which is another way of saying that "the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal. 4th 805, 817.) This presumption is " 'an admonition to the court' " that provides "a starting point for review," but "is only a presumption, and may be overcome." (*Id*. at p. 818.) "Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings." (*Ibid*.) In order to implement this standard, ultimately, the court still must weigh the evidence, make its own credibility determinations, and reach its own independent decision. (*Rodriguez v. City of Santa Cruz* (2014) 227 Cal.App.4th 1443, 1451; *Vaill v. Edmonds* (1991) 4 Cal.App.4th 247, 258 [trial court must "make its own determination as to whether the administrative findings should be sustained"]; *James v. Board of Dental Examiners* (1985) 172 Cal.App.3d 1096, 1105 [trial court "reweighs the evidence in a limited trial de novo"]; *Petrucci v. Board of Medical Examiners* (1975) 45 Cal.App.3d 83, 86–87.) This requires the trial court to weigh the same factors used by the agency in rendering its findings, in order to make its own independent determination as to the appropriateness of revoking a professional license. (*Broney v. California Com. on Teacher Credentialing* (2010) 184 Cal.App.4th 462, 474–475 (*Broney*) [concluding it was error for trial court not to apply the *Morrison* factors to revocation proceeding for repeated convictions for driving while intoxicated].)

We review the trial court's factual findings for substantial evidence, and its legal conclusions de novo. (*Rodriguez v. City of Santa Cruz*, *supra*, 227 Cal.App.4th at p. 1452; *Angelier v. State Board of Pharmacy* (1997) 58 Cal.App.4th 592, 595, fn.3.)

The standards for revocation of a teaching license were first enumerated in *Morrison*, *supra*, 1 Cal.3d 214. In *Morrison*, a teacher engaged in a brief homosexual relationship outside of school with another teacher; some years later, after the fact of this relationship was made known, the Board of Education investigated the matter and ultimately revoked the appellant's teaching credentials because the homosexual acts, even though conducted outside of and away from the school, constituted "immoral and unprofessional conduct, and an act involving moral turpitude." (*Id*. at pp. 218–220.)[8]

In *Morrison*, the California Supreme Court held that the Board of Education could not abstractly characterize conduct as " 'immoral,' " " 'unprofessional,' " or " 'involving moral turpitude,' " unless it found that the specific conduct involved "indicates that the petitioner is unfit to teach." (*Morrison*, *supra*, 1 Cal.3d at p. 229.) In determining whether the conduct at issue revealed the teacher was unfit to teach, the court noted trial courts could and should consider the following nonexhaustive list: (1) "the likelihood that the conduct may have adversely affected students or fellow teachers"; (2) "the degree of such adversity anticipated"; (3) "the proximity or remoteness in time of the conduct"; (4) "the type of teaching certificate held by the party involved"; (5) "the extenuating or aggravating circumstances, if any, surrounding the conduct"; (6) "the praiseworthiness or blameworthiness of the motives resulting in the conduct"; (7) "the likelihood of the

---

[8]    While the Education Code has since been substantially rewritten and renumbered, and the specific section at issue in *Morrison* no longer exists, the code section at issue in this case permits respondent to revoke teaching credentials for similar reasons, i.e., "for immoral or unprofessional conduct, or for persistent defiance of, and refusal to obey, the laws regulating the duties of persons serving in the public school system, … or for evident unfitness for service." (Ed. Code, § 44421.) Indeed, here, respondent revoked appellant's teaching credentials based on findings of unprofessional and immoral conduct, and for acts of moral turpitude.

recurrence of the questioned conduct"; and (8) "the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers." (*Ibid*.) These factors are relevant to the extent that they assist in determining "the teacher's fitness to teach, i.e., in determining whether the teacher's future classroom performance and overall impact on his students are likely to meet the board's standards." (*Id*. at p. 230.) Where an examination is made with such factors focusing the inquiry between the conduct alleged and the teacher's fitness to teach, only *then* are terms such as "unprofessional," "moral turpitude," and "immoral" sufficiently particularized as to avoid constitutional due process concerns for vagueness. (*Id*. at pp. 230–235.)

Lest there be any confusion, the California Supreme Court made clear in *Morrison* itself that this multifactored analysis was subject to independent review by the courts. In closing, the court specifically stated: "the relevant statutes, as well as the applicable principles of constitutional law, require only that the board properly find, pursuant to the precepts set forth in this opinion, that an individual is not fit to teach. Whenever disciplinary action rests upon such grounds *and has been confirmed by the judgment of a superior court following an independent review of the evidence*, this court will uphold the result." (*Morrison*, *supra*, 1 Cal.3d at p. 240, italics added.) While this opinion predated *Bixby* by several years, and thus predated the general requirement that a fundamental vested right be subject to independent judgment by the trial courts, the court in *Morrison* cited to two opinions—*Yakov v. Board of Medical Examiners* (1968) 68 Cal.2d 67 and *Moran v. Board of Medical Examiners* (1948) 32 Cal.2d 301—both of which were later relied upon in *Bixby*. (See *Bixby*, *supra*, 4 Cal.3d at p. 143, fn. 9.) Thus, from both the general rule set forth in *Bixby* concerning review of agency actions substantially affecting fundamental vested rights, and the specific rule in *Morrison* concerning revocation of teaching credentials, it is abundantly clear the trial court must apply its own independent judgment to the matter at hand.

11.

*B.*     *The Trial Court Did Not Render an Independent Judgment Based on an Analysis of the Factors Set Forth in Morrison*

In this case, it is clear the trial court did not render an independent judgment and instead deferred to the administrative agency's findings.[9] We find this based both on the court's language used to explain its decision and its failure to apply the *Morrison* factors on its own. This warrants reversal of the judgment and remand to the court to conduct a "limited trial de novo" and render an independent judgment on the evidence. This will, of course, require the court to evaluate the *Morrison* factors.

The language the trial court used in its decision shows its failure to exercise its independent judgment regarding any part of this matter. After recounting the procedural background of the hearing before the ALJ and respondent's ultimate decision revoking the credentials, the court noted the ALJ and respondent "obviously differed in their opinion regarding the appropriate remedy needed to sufficiently protect the public, schoolchildren, and the teaching profession." However, the court found it "significant to note that the ALJ and [r]espondent both shared a great number of the same observations about the case." The court noted "both found that [appellant] had made positive contributions to education and had received several commendations as a teacher"; both "very appropriately rejected [appellant's] misdemeanor conviction as a factual basis to support any type of negative action against the teaching credentials";[10] both "concluded that [appellant] engaged in unprofessional and immoral conduct when he failed to report

---

[9]     We note that respondent makes several waiver arguments in its brief, including that appellant did not present all material evidence in the record in support of the judgment. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) We do not find appellant's opening brief so lacking as to warrant waiver. We find respondent's other waiver arguments similarly unconvincing.

[10]     It is perhaps because of the excessive deference the trial court gave to the administrative proceedings that it failed to recognize that, in fact, respondent did not discount the misdemeanor conviction at all. Instead, as discussed further below, respondent *specifically* factored this misdemeanor conviction into its decision rejecting the ALJ's recommendation and revoking appellant's teaching credential.

to work for the [BCSD] due to a purported illness, while still being able to work for CSUB during the same time period"; and both "agree that [appellant] made multiple misrepresentations during the investigation and pendency of this matter" and lacked "remorse." As such, the only factual findings the court made were that the ALJ and respondent agreed with each other on a number of points.

The trial court then went on to discuss the legal standard to be applied. However, it failed to include any discussion of the independent judgment standard. Instead, it stated that a penalty imposed by an administrative agency was "a matter vested in the discretion of the agency" and that such a decision would not be disturbed "unless there has been a clear abuse of discretion." The two cases the court then cited—*Nightingale v. State Personnel Board* (1972) 7 Cal.3d 507 and *Harris v. Alcoholic Beverage Control Appeals Board* (1965) 62 Cal.2d 589—were not cases involving the "independent judgment" standard. *Nightingale* applied the "substantial evidence" standard used in cases when a "fundamental vested right" is not at issue. (*Nightingale*, at p. 514; *Mann v. Department of Motor Vehicles* (1999) 76 Cal.App.4th 312, 320 ["The 'substantial evidence' rule applies when the administrative decision neither involves nor substantially affects a vested right."].) The opinion in *Harris*, meanwhile, was issued in 1965, some six years prior to the California Supreme Court's decision in *Bixby*, which first articulated that administrative decisions substantially affecting vested fundamental rights must be subject to independent judgment review. (See *Bixby*, 4 Cal.3d at pp. 141–147.)

Of the other cases cited in this section of the opinion, one—*Brown v. Gordon* (1966) 240 Cal.App.2d 659—was likewise decided prior to *Bixby*. Another—*Szmaciarz v. State Personnel Board* (1978) 79 Cal.App.3d 904—relied on *Nightingale, Harris*, and *Brown* for its authority that disciplinary decisions fell within the discretion of the administrative agency and should not be disturbed unless "clearly excessive." (*Szmaciarz*, at p. 921.) The only cited case that recognized and appeared to consider the independent judgment standard at all—*Cadilla v. Board of Medical Examiners* (1972) 26

Cal.App.3d 961—ultimately declined to apply it, explaining that *Bixby* applied only to the determination of whether the appellant had engaged in acts of moral turpitude and did not apply to the question of what penalty was to be imposed for those acts. (*Cadilla*, at pp. 965–968.) Thus, nothing about the trial court's legal citations indicates that it understood it was to be applying its own independent judgment to the case.

After citing this law about the deference to be given to the agency's choice of punishment, the trial court then noted that this "appears to be a case in which 'reasonable minds might differ as to the propriety of the penalty imposed.' " The court then observed that it would not choose the same punishment as respondent, and would instead favor the one-year suspension recommended by the ALJ, but then found the penalty was "within the bounds of reasonable discretion." It thus concluded respondent did not abuse its discretion and denied the petition. All of this leads us to the conclusion that the court did not apply its independent judgment in denying appellant's writ. It is clear the court did not appreciate its responsibility to make an independent judgment as to the facts of the case or independently review the *Morrison* factors, but rather believed its role was constrained to determining whether respondent had engaged in a "clear abuse of discretion" as to the limited question of which penalty was appropriate. This is fundamentally incorrect, and shows the court did not appreciate the scope and breadth of its decisionmaking power.[11] This alone is sufficient for reversal.

---

[11] We do note respondent's argument the trial court made an explicit finding that it was exercising its independent judgment. Following its minute order, the court directed respondent to prepare a draft order "consistent with this ruling for the Court's signature." The draft order respondent prepared, which the court signed, stated: "The Court, having read and considered all pleadings and documents on file in this action, having heard oral argument, having taken the matter under submission, and *having exercised its independent judgment*, hereby denies the petition for writ of administrative mandate." (Italics added.) We do not think a formulaic recitation of a different standard in an order prepared by the prevailing party is sufficient to insulate the court's decision from criticism, particularly where the court's own minute order explaining its decision indicated it neither appreciated the standard it was required to apply nor in fact applied

However, even more importantly, the trial court failed to analyze or interact—in any way—with the factors enumerated in *Morrison*. Respondent concedes this point, noting the "trial court did not conduct its own *Morrison* analysis." We do not see how the court could exercise its duty to conduct an independent review of the question at the heart of *Morrison*—whether appellant's behavior evidences his "unfitness to teach"—without reviewing the facts and applying them to any of the applicable *Morrison* factors or others as may be appropriate to the case. We do not find respondent's argument to the contrary to be persuasive. Respondent argues title 5, section 80302 of the California Code of Regulations only requires *respondent* to employ the *Morrison* factors, not the trial court. However, the requirement that the court employ the *Morrison* factors does not derive from these regulations, but rather from *Morrison* itself. The Supreme Court in *Morrison* clearly called for independent court review of the factors set forth in that case, noting teachers may still be disciplined if the relevant body "properly find[s], *pursuant to the precepts set forth in this opinion*, that an individual is not fit to teach. Whenever disciplinary action rests upon such grounds *and has been confirmed by the judgment of a superior court following an independent review of the evidence*, this court will uphold the result." (*Morrison*, 1 Cal. 3d at p. 240, fn. omitted, italics added.) Furthermore, virtually every published case concerning this issue notes the trial court in fact applied the *Morrison* factors when discipline was imposed for unprofessional or immoral conduct, and the Court of Appeal has repeatedly endorsed this approach. (See, e.g., *Crawford v. Commission on Professional Competence of Jurupa Unified School District* (2020) 53 Cal.App.5th 327, 338 ["Applying the *Morrison* factors, the trial court here found that the [commission's] decision was supported by the weight of the evidence."]; *Broney*, *supra*,

that standard. (See *Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, 435.) Nor do we think the court's passing reference in its own minute order to "the weight of the evidence" shows the exercise of independent judgment, since the court clearly viewed its decision as a deferential one concerning the choice of punishment to be imposed. (*Ibid*.)

15.

184 Cal.App.4th at p. 476 ["the trial court, in addition to applying a per se rule, weighed the evidence under the *Morrison* factors"]; *Governing Board v. Haar* (1994) 28 Cal.App.4th 369, 383 ["In applying the *Morrison* factors, the trial court stated that .…"]; *West Valley-Mission Community College District v. Concepcion* (1993) 16 Cal.App.4th 1766, 1777 [observing the trial court "considered the most pertinent *Morrison* factors and concluded correctly that Miller is unfit to teach"]; *Bevli v. Brisco* (1989) 211 Cal.App.3d 986, 991 ["The *Morrison* factors must be analyzed in all cases of teacher discharge for evident unfitness."]; see *San Diego Unified School District v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1140; *San Diego Unified School District v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1462–1466; *Woodland Joint Unified School District v. Commission on Professional Competence* (1992) 2 Cal.App.4th 1429, 1440; *Bassett Unified School District v. Commission on Professional Competence* (1988) 201 Cal.App.3d 1444, 1453–1454; *Perez v. Commission on Professional Competence* (1983) 149 Cal.App.3d 1167, 1174–1175; *Board of Education v. Commission on Professional Competence* (1980) 102 Cal.App.3d 555, 560; *Board of Trustees v. Judge* (1975) 50 Cal.App.3d 920, 930.)

This independent review is of critical importance. As has been noted, "*Morrison* is followed by the California courts for good reason. In the absence of a consideration of all the evidence and a reflection of the factual base on which to apply the *Morrison* standards, the trial court's finding becomes little more than an abstract moral judgment.… Without the *Morrison* standards 'evident unfitness to teach' would be vulnerable to such a broad application virtually every teacher in the state could be subject to discipline and discharge." (*San Dieguito Union High School District v. Commission on Professional Competence* (1982) 135 Cal.App.3d 278, 284–285.) This independent review helps protect against the revocation of a vested right in a professional license for reasons that are arbitrary, capricious, prejudicial, or motivated by other personal or improper animus, and prevents the license revocation from becoming " 'a "badge of infamy," ... fixing upon

16.

[the teacher] the stigma of an official defamation of character.' " (*Morrison*, *supra*, 1 Cal.3d at p. 239.)

Nor can we say the lack of an independent review here was not prejudicial. (See *Broney*, *supra*, 184 Cal.App.4th at p. 476 [conducting prejudice review upon finding legal error in trial court's review of license revocation].) In evaluating harmless error, we ask whether it would have been " 'reasonably probable a more favorable result would have been reached absent the error.' " (*Thornbrough v. Western Placer Unified School District* (2013) 223 Cal.App.4th 169, 200.) Here, we conclude the error was prejudicial. On even a cursory review, we know the trial court had at least a somewhat different view of the evidence than respondent, since it specifically noted it preferred the ALJ's lesser sanction of suspension to full and permanent revocation of appellant's teaching license. Further, it is clear that respondent's findings and conclusions are far from reproach and, were a court to review these findings and conclusions independently in a limited trial de novo, it is reasonably probable it might reach a result more favorable to appellant.

We note only a few issues readily apparent from our review of the record here. First, because the central lesson of *Morrison* is that courts must look to whether the specific conduct alleged renders appellant unfit to teach, we observe respondent's own decision is internally inconsistent in this regard. Respondent states it "failed to establish by clear and convincing evidence [appellant]'s evident unfitness to teach." Respondent found the "evidence did not demonstrate [appellant] has a fixed character trait not remediable upon receipt of notice his conduct fails to meet expectations of the employing school district." The decision states that there "was no evidence of such notice prior to the visit" from the district's human resources representative and the superintendent. Further, "[u]pon receipt of this notice, [appellant] resigned immediately" and "did not continue his dishonest behavior." Respondent also found there was "no evidence [appellant] has committed any further dishonest behavior since then."

In fact, respondent's decision then went on to laud appellant's prior service as a teacher, noting there was "also no evidence that [appellant] is not fit, or is unsuitable for, teaching by reason of temperamental defects or inadequacies." Instead, "the evidence demonstrated [appellant] had a [15]-year career with the District, the bulk of which were marked by quality teaching, leadership, and volunteering with his students to help them achieve educational accomplishments, without issues raised by the District." Following his resignation from the District, appellant "has continued his contribution to education, leadership, and to his community through his work with CSUB over the past three years," per respondent. Respondent explains that, "[w]hile this does not justify [appellant]'s egregious decision to lie to his District while working elsewhere and leaving his students without consistent, effective teaching, the evidence fails to show a temperamental defect. Rather, it shows poor judgment exercised in response to a work environment he found challenging."

Nonetheless, shortly thereafter in the same written decision, respondent directly contradicts those statements, finding that appellant's "misconduct makes him unfit to teach." Respondent also concluded appellant was "likely to engage in similar dishonest behavior in the future." These statements stand in direct contradiction to findings made just shortly before in the very same ruling, concerning the same operative issue at the crux of respondent's (and the trial court's) inquiry in this matter: whether appellant's purportedly immoral and unprofessional conduct makes him unfit to teach. Of course, without an ultimate factual finding that appellant is unfit to teach, it would be improper for respondent to revoke his teaching license. (See *Morrison*, 1 Cal. 3d at p. 240 [holding California law requires respondent to find "an individual is not fit to teach"].)

The trial court also noted respondent appropriately rejected the 20-year-old, expunged misdemeanor as a basis for discipline. This, however, is untrue. While respondent's decision ultimately states there was no "nexus between [appellant's misdemeanor conviction] and his fitness to teach," it is simply wrong to say this

18.

misdemeanor was not important to respondent's decision. In fact, respondent's written decision explicitly and repeatedly considers this conviction in weighing appellant's conduct and his fitness as a teacher. Respondent specifically concluded this misdemeanor conviction was "unbecoming of a teacher," that it did not matter if appellant pled to a different or lesser charge, and that the conviction showed "unprofessional conduct" because appellant is a role model for his students. Respondent also specifically found appellant's prior conviction was a basis to conclude he had engaged in "immoral conduct." Further, respondent concluded appellant's misdemeanor conviction "demonstrates dishonesty." Later, in discussing the praiseworthiness or blameworthiness of appellant's conduct, respondent stated "there is only blameworthiness attributable to respondent's motives in committing [the acts leading to his misdemeanor conviction]. Thus, this factor weighs heavily against fitness." Respondent also found the prior misdemeanor conviction helped negate any mitigation appellant sought to prove, noting appellant "presented no evidence he was under any particular emotional or physical difficulties at the time" of his misdemeanor conviction. Whatever the reason, the court clearly was mistaken in its belief that respondent did not rely on appellant's prior misdemeanor conviction in evaluating his fitness to teach. It seems likely the court would not reach the same conclusions in an independent review of this case, given this misdemeanor conviction was completely unrelated to the crux of the dispute, was decades old, had been disclosed previously, and has been expunged.

Further, it is reasonably probable an independent review of the evidence may come to different conclusions about other critical issues for analysis under *Morrison*, including the blameworthiness or severity of appellant's conduct and any harm done to the school district or its pupils. For instance, in rejecting the ALJ's decision and revoking appellant's teaching credentials, respondent speaks in exceptionally grave terms of the blameworthiness of appellant's actions, focusing particularly on his purported "dishonesty" which impacted "the youngest and most vulnerable of students." While we

certainly understand school administrators might prefer prompt decisions be made about whether a teacher continues in their current employment, it does not strike us as the gravest of sins for a teacher to use accrued sick leave for several weeks while considering whether they will remain with their current position, especially in the context of what was clearly a tempestuous and uncomfortable working relationship, even if this is technically improper under the district's policies.[12] We note several cases in which respondent or its predecessor entities have imposed much lesser penalties for seemingly much more severe misconduct. (*Broney*, *supra*, 184 Cal.App.4th at p. 468 [respondent imposed a stayed 60-day suspension following teacher's third DUI conviction]; *Governing Board v. Haar*, *supra*, 28 Cal.App.4th at pp. 374–375 [respondent declined to uphold suspension of teacher accused of multiple instances of inappropriate physical contact with female middle school students]; *Bassett Unified School District v. Commission on Professional Competence*, *supra*, 201 Cal.App.3d at pp. 1448–1450 [respondent found teacher should retain her job at a school district from which she had taken sick leave for two entire school years, while simultaneously working throughout both terms at two other teaching positions; no indication license revocation was even considered].)

These prior instances of less severe penalties seem particularly notable in light of the fact appellant specifically testified the superintendent who he claimed was retaliating against him had threatened he "was going to get [appellant's] credential, and that he had friends at [respondent], and he was going to make sure that not only my credential was going to be revoked, that they were going to have me pay some ungodly amount of money." Another witness corroborated having heard the superintendent claim "he would have people's credentials removed or taken from them." Various facts about this case

---

[12] Again, it is not beyond a doubt that this behavior was, in fact, improper under the district's policies. It appears appellant filed the forms he was requested to file, and that there was some evidence it was BCSD that determined employees would use sick leave first before accessing other types of leave.

also lend credence to this narrative: that an assistant superintendent in charge of over 4,000 employees across 40 schools would recognize one particular teacher in a few photographs posted online, know that particular teacher was out on sick leave, decide to independently investigate the matter despite the photographs not depicting anything necessarily improper, and then report these facts to his superintendent; that the superintendent in charge of such a large school district would then direct an investigation as to any violations of leave policies based on these photographs; and the fact that respondent rejected a well-reasoned decision by an ALJ—a decision it had substantially won—in favor of one using hyperbolic language as justification for revoking the teaching credentials of a seemingly well-regarded and well-respected career educator.

The hyperbolic language which repeatedly stresses the severity of the harm to appellant's pupils is particularly notable as being out of place with the facts of this case. Respondent does not suggest appellant was required by contract or otherwise to remain employed with BCSD. Indeed, all parties seem to believe it would have been entirely proper for appellant to simply resign at the start of the school year. It is therefore unclear how appellant taking leave—even assuming such leave was somehow improper— impacted his students in any particularly greater or different manner than if he had just resigned on the first day of school. While we understand it may have been inconvenient for the school district to find a substitute teacher on short notice, it is hard to see how this injury to the district would be nearly as severe as respondent's decision suggests, especially in a district as large as BCSD. If appellant had simply resigned, BCSD would still have been required to find a replacement teacher for his students. And if he had resigned, his students would have missed out on his apparently exceptional teaching capabilities regardless. We have been pointed to nothing in the record suggesting appellant's students were aware of any alleged violations of the district's leave policies by appellant, suggesting any students who may have viewed appellant as a role model were not impacted by his purported "dishonesty." On the whole, we find the light in

21.

which appellant's conduct is cast in terms of its impact on his students doubtful. Further, despite recognizing specifically that one of the factors in mitigation was "the absence of any prior record of adverse action over many years of educational service," and despite conceding appellant in fact had no record of prior discipline over his many years of estimable service, respondent nevertheless found this was "not a factor in mitigation."[13]

Ultimately, we make no findings on these issues at this point, as that is not our current task. We recount them here simply to explain why we are convinced the trial court's errors are not harmless. In light of all of the above, we are satisfied it is reasonably probable the court's exercise of independent judgment might lead to a more favorable outcome for appellant here. Thus, on remand, the court must exercise its independent judgment upon the evidence of this case, conduct a limited trial de novo, and apply the *Morrison* factors to determine whether appellant's alleged conduct ultimately rendered him unfit to teach.

---

[13] Respondent's decision also appears to have wholly discounted other evidence of appellant's good character and "emotional or physical difficulties … which substantially contributed to the misconduct," both of which are expressly mitigating factors. (Cal. Code Regs., tit. 5, § 80300, subd. (m).)

# DISPOSITION

Given the foregoing, we reverse the judgment of the trial court, with directions to reconsider this matter in a manner not inconsistent with this opinion.  Appellant shall recover his costs on appeal.

PEÑA, J.

WE CONCUR:


DETJEN, Acting P. J.


HARRELL, J.